1

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT

9    CENTRAL DISTRICT OF CALIFORNIA

10

11   SARA AHERN,                         Case No.  2:23-cv-07753-WLH (SKx)

              Plaintiff,                 **ORDER GRANTING**
12                                       **DEFENDANTS' MOTION TO**
                                         **DISMISS OR STAY PROCEEDINGS**
13   v.                                  **AND COMPEL ARBITRATION [13]**

14   FISERV, INC.; FISERV SOLUTIONS,
     LLC; and DOES 1 through 10,
15   Inclusive,

16            Defendants.

17

18        This matter comes before the Court on Defendants Fiserv, Inc. and Fiserv

19   Solutions, LLC (collectively "Defendants") Motion to Dismiss or Stay the

20   Proceedings and Compel Arbitration (the "Motion") (Docket No. 13).  Plaintiff Sara

21   Ahern ("Plaintiff") filed its Opposition to the Motion (the "Opposition").  (Docket No.

22   16).  Defendants filed a Reply in Support of its Motion (the "Reply").  (Docket No.

23   18).

24        On October 27, 2023, the Court held a hearing and heard oral arguments from

25   all parties.  During oral arguments, Plaintiff requested leave for further briefing on the

26   narrow issue of the applicability of the delegation clause.  The Court granted

27   Plaintiff's request and continued the hearing on Defendants' Motion to December 8,

28   2023.  (Docket No. 25).  On November 10, 2023, Plaintiff filed its supplemental

1  briefing opposing Defendants' Motion (the "Supplemental Opposition").  (Docket No.

2  26).  On November 21, 2023, Defendants filed their response to Plaintiff's

3  supplemental briefing (the "Sur-reply").  (Docket No. 27).  This matter is fully

4  briefed.

5          On December 7, 2023, the Court issued a tentative order.  On December 8,

6  2023, the parties submitted to the Court's tentative order, which the Court now adopts

7  as its final Order.

8          For the reasons discussed below, Defendants' Motion is **GRANTED** and the

9  action is **STAYED** pending the arbitration proceedings.

10  **I.    BACKGROUND**

11          Plaintiff was employed by Defendants from approximately 2002 to 2022.  (*See*

12  Not. of Removal, Exh. 1 ("Complaint"), Docket No. 1-1 ¶ 14).  Defendants are a

13  global financial services technology company offering products to banks, businesses,

14  and consumers.  (Decl. of Eduardo Stutz ("Stutz Decl."), Docket No. 13-2 ¶ 4).

15  Plaintiff brings this action against both Fiserv, Inc. and Fiserv Solutions, LLC under

16  joint employers and/or agents, and alter ego liability.  (Compl. ¶¶ 1–7).

17          On March 5, 2002, Plaintiff completed an employment application with

18  Defendants, which contained a Mutual Agreement [to] Arbitrate Claims (the

19  "Agreement").  (Stutz Decl., Docket No. 13-2 ¶ 9, Exh. A).[1]  Plaintiff signed the

20  Agreement on March 5, 2002, and Defendants' representative countersigned on April

21  19, 2002.  (*Id.* ¶ 9.e).  Plaintiff received her offer letter on March 19, 2002, indicating

22  her position, title, and start date.  (Supp. Decl. of Eduard Stutz ("Stutz Decl. II"),

23  Docket No. 27-1, Exh. A).  On April 15, 2002, as part of her employee onboarding

24

25  [1] The Court notes that in 2002, Plaintiff was assigned to work for a Fiserv, Inc.
   subsidiary named ITI of Nebraska, Inc.  (Docket No. 13-2 ¶ 9.f).  Effective on January

26  1, 2018, Plaintiff was then assigned to Fiserv Solutions, LLC until her termination.
   (*Id.*).  Fiserv Solutions, LLC is a wholly-owned subsidiary of Fiserv, Inc. and its sole

27  member is Fiserv Inc. (*Id.* ¶ 6).  For ease of reference and to avoid any confusion, the
   Court will only refer to the named defendants Fiserv, Inc., or Fiserv Solutions, LLC,

28  or to both entities as Defendants.

orientation procedures, Plaintiff signed an acknowledgment that she received various employment related documents including a copy of the Agreement.  (*Id.* ¶ 9.d).

Plaintiff contends that she was instructed to sign the Agreement "to start working" and "did not believe nor was [she] told that [she] could negotiate any of the terms of the arbitration agreement."  (Further Decl. of Sara Ahearn, ("Ahearn Decl. II"), Docket No. 26-1 ¶ 2).  Plaintiff further alleges that "no one ever explained to [her] what arbitration was, the process for arbitration, or the rules that would apply" and did not receive a copy of the agreement, nor know how to locate it online.  (*Id.*).

The Arbitration Agreement states, in relevant part:

1. Scope of Arbitration
   The parties agree to submit to arbitration any and all disputes arising from or related to certain compensation matters and claims of sexual harassment during the employment relationship, or the termination of employment between the parties for which a court otherwise would be authorized by law to grant relief.

   Except as excluded in the following paragraph, the claims covered by this Agreement include, but are not limited to, claims for: amounts of compensation owed and due; claims concerning sexual harassment; termination claims concerning breach of any contract or covenant, express or implied, relating to employment, benefits or compensation; tort claims; discrimination claims, including but not limited to race, sex, religion, national origin, age, marital status, handicap, disability or medical condition; and claims for violation of any federal, state or other governmental constitution, statute, ordinance or regulation.

   This Mutual Agreement Arbitrate Claims does <u>not</u> apply to or cover claims for: the appropriateness of the employee's salary as compared to other employees or the outside labor market, merit increases in salary, promotions or demotions and their related salary action, commission plan rates, management bonus or employee incentive plan rates; disciplinary actions during the employment relationship; workers' compensation benefits or compensation; claims for unemployment compensation; claims by the Company for injunctive and/or other equitable relief for unfair competition and/or the use or unauthorized disclosure of trade secrets or confidential information;

and claims based upon an employee pension or benefit plan, the terms of which contain an arbitration or other non-judicial dispute resolution procedure, in which case the provisions of such plan shall apply.

In utilizing this process and signing this agreement, the employee and the Company relinquish all rights to pursuing through the courts the claims covered by this Agreement.

The parties further agree that this arbitration process shall be the exclusive means for resolving all disputes made subject to arbitration, including any issue or dispute concerning the Agreement itself.

2. Governing Law
Notwithstanding any other choice of law provisions in the Agreement, the interpretation and enforcement of the arbitration provisions of this Agreement shall be governed exclusively by the Federal Arbitration Act, (FAA), 9 U.S.C. §§ et seq., and shall otherwise be governed by the law of the State of _____.
....

7. American Arbitration Association Rules Apply as Modified Herein
Any arbitration hereunder shall be conducted under the Model Employment Procedures of the American Arbitration Association ("AAA"), as modified herein.
....

14. Confidentiality
The arbitration proceedings shall be confidential. Neither party shall disclose any information about documents produced in connection with the proceedings, except in the course of a judicial, regulatory, or arbitration proceedings, or as may be requested by governmental authority. Before making any disclosure permitted by the preceding sentence, the party shall give the other party reasonable, written notice of the intended disclosure and an opportunity to protect its interests. Expert witnesses and stenographic reporters shall sign appropriate nondisclosure agreements.

The parties acknowledge and agree that if a breach of this confidentiality provision occurs, the non-breaching party is free to pursue all available remedies provided by law.

(Agreement, Docket No. 13-3 at §§ 1–2, 7, 14) (emphasis and blanks in original).

4

1    Around 2022, when Plaintiff was 67 years old, Plaintiff began to experience

2    health issues related to her high blood pressure/hypertension.  (Compl., ¶ 18).  As a

3    result, on March 31, 2022, Plaintiff sought treatment at an urgent care facility, was

4    prescribed medication, and instructed to take on a reduced workload.  (*Id.*).  Plaintiff

5    worked fewer hours during the months of April and May 2022 and sought further

6    medical treatment including attending doctors' appointments for testing.  (*Id.* ¶ 19).

7    Plaintiff alleges that her employer was aware of her medical condition and her need to

8    limit her work hours to monitor her blood pressure.  (*Id.*).

9    In June 2022, Defendants terminated Plaintiff's employment.  (*Id.* ¶ 20).

10   Plaintiff alleges that the termination was due to her age, and disability.  (*Id.*). Plaintiff

11   also alleges that Defendant hired younger, male employees to fill Plaintiff's job duties

12   despite their lack of experience because they "cost the company much less."  (*Id.*).

13   Plaintiff requested that the company transfer her to a new position and applied for at

14   least two other positions with Defendants.  (*Id.* ¶ 22).  Plaintiff was not re-hired.  (*Id.*)

15   On September 22, 2023, Defendants filed the instant Motion seeking to dismiss

16   or stay the matter and compel arbitration.  (Docket No. 13).  The crux of Defendants

17   argument is that the parties entered into a valid arbitration agreement, which should be

18   enforced pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2.  On October

19   6, 2023, Plaintiff filed her Opposition.  (Docket No. 16).  Among other things,

20   Plaintiff claimed that the Agreement is both procedurally and substantively

21   unconscionable.  Plaintiff also argued against the applicability of the delegation

22   clause, noting that "it is unclear whether Defendants are saying the enforceability of

23   the arbitration agreement has been delegated to the arbitrator… [but] given the dearth

24   of discussion [Defendants] provide on the issue" it found it prudent to raise the issue.

25   (*Id.* at 24).  On October 13, 2023, Defendants filed their Reply and argued explicitly,

26   for the first time, that the Agreement's delegation clause applied and that the

27   agreement is neither procedurally nor substantively unconscionable.  (Docket No.

28

5

1  18).[2]

2        On October 26, 2023, the Court issued a Tentative Order granting Defendants'

3  Motion and staying the action pending arbitration proceedings based on the

4  Agreement's delegation clause.  On October 27, 2023, the Court held a hearing and

5  heard oral arguments from all parties.  During oral arguments, Plaintiff requested

6  leave for further briefing on the narrow issue of the delegation clause.  The Court

7  granted Plaintiff's request and continued the hearing on Defendants' Motion to

8  December 8, 2023.  (Docket No. 25).  On November 10, 2023, Plaintiff filed its

9  Supplemental Opposition to Defendants' Motion.  (Docket No. 26).  On November

10  21, 2023, Defendants filed their Sur-reply.  (Docket No. 27).  This matter is fully

11  briefed.

12  **II.  DISCUSSION**

13        Under the FAA, the court's role is "limited to determining (1) whether a valid

14  agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses

15  the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126,

16  1130 (9th Cir.2000).  "However, these gateway issues can be expressly delegated to

17  the arbitrator where 'the parties clearly and unmistakably provide otherwise.'" *Id.*

18  (quoting *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643,

19  649 (1986)).  "[T]here is a presumption that courts will decide which issues are

20

21    [2] At oral arguments, Plaintiff argued that Defendants only raised the delegation clause

22  issue for the first time in its Reply.  Notably, however, it is the plaintiff who bears the
    burden of challenging a delegation clause even where, as here, the defendant did not

23  raise the issue until its Reply.  *See, e.g.*, *Oliver v. First Century Bank, N.A*, No. 3:17-
    CV-00620-MMA (KSC), 2018 WL 1426877, at *2 (S.D. Cal. Mar. 22, 2018)

24  (rejecting plaintiff's contention that "[d]efendants carried the burden to invoke the
    delegation clause in support of the motion to compel arbitration, which they did not

25  do"); *McLellan v. Fitbit, Inc.*, No. 3:16-CV-00036-JD, 2017 WL 4551484, at *4 (N.D.
    Cal. Oct. 11, 2017) (rejecting plaintiff's argument that defendant waived the

26  delegation clause by failing to raise it).  Further, Plaintiff did address the delegation
    clause, albeit not thoroughly in her Opposition.  Nevertheless, in the interest of aiding

27  the Court's final decision on the Motion, the Court permitted the parties to file

28  supplemental briefing.

1    arbitrable; the federal policy in favor of arbitration does not extend to deciding

2    questions of arbitrability." *Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d

3    1069, 1072 (9th Cir. 2013).

4    **A. <u>Delegation Clause</u>**

5         i. *Plain Language of the Agreement*

6         As an initial matter, the Court must decide whether the Agreement delegates

7    arbitrability to the arbitrator under the delegation clause.  Generally, courts may

8    resolve the issue of whether an arbitration agreement is valid.  "The presence of a

9    delegation clause," however, "limits the issues that a court may decide." *Caremark*

10   *LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022).  Because "a valid—

11   *i.e.*, enforceable—delegation clause commits to the arbitrator nearly all challenges to

12   an arbitration provision," the threshold question for a court considering an arbitration

13   agreement containing a delegation clause is whether the delegation clause itself is

14   valid. *Id.* at 1029–30.  "A delegation clause is enforceable when it [1] manifests a

15   clear and unmistakable agreement to arbitrate arbitrability, and [2] is not invalid as a

16   matter of contract law." *McLellan*, 2017 WL 4551484, at *1 (citing *Brennan v. Opus*

17   *Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Momot v. Mastro*, 652 F.3d 982,

18   988 (9th Cir. 2011) ("[T]he question of arbitrability is left to the court unless the

19   parties clearly and unmistakably provide otherwise.").  If the delegation clause is

20   enforceable, all other questions regarding the validity of the arbitration agreement

21   must go to the arbitrator "to decide in the first instance." *Caremark*, 43 F.4th at 1030.

22        Here, the arbitration clause provides: "[t]he parties further agree that this

23   arbitration process shall be the exclusive means for resolving all disputes made subject

24   to arbitration, including any issue or dispute concerning the Agreement itself."

25   (Docket No. 13-3 at § 1).  This language is distinguishable from cases such as *Momot*,

26   in which the Court found the delegation clause's language clearly and unmistakably

27   granted the power to decide arbitrability to the arbitrator.  Specifically, the Agreement

28   lacks language that the arbitrator is to determine the "validity or application" of the

agreement.  *Momot*, 652 F.3d at 988 ("We hold that this language, delegating to the arbitrators the authority to determine 'the validity or application of any of the provisions of' the arbitration clause, constitutes "an agreement to arbitrate threshold issues concerning the arbitration agreement.").  Instead, this clause provides broadly that arbitration "shall be the exclusive means for resolving all disputes made subject to arbitration" such as "issues or dispute concerning the Agreement."  (Docket No. 13-3 at § 1).  This language is similar to the language in cases in which courts have found the delegation clause language was too broad to indicate a clear and unmistakable intent to delegate the threshold issue of arbitrability to the arbitrator.  *See e.g., Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069, 1077 (N.D. Cal. 2015) (finding lack of clear and unmistaken intent in agreement that stated "all disputes, controversies, claims, causes of action and/or alleged breaches or failures to perform arising out of or relating to this Agreement" are subject to arbitration); *see Kimble v. Rhodes College, Inc.*, No. C–10–5786 EMC, 2011 WL 2175249, at *2 (N.D.Cal. June 2, 2011) (finding that language requiring "any dispute" between the parties be submitted to arbitration did not clearly encompass arbitrability).

    While any doubts concerning the scope of arbitration should be resolved in favor of arbitration, the reverse is true when answering the preliminary question about arbitrability.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) ("[T]he law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement"—for in respect to this latter question the law reverses the presumption.").  As written, the delegation clause may include the issue of arbitrability, but, because it is not explicitly contemplated in the agreement, the Court will not impart this meaning into the Agreement.  As such, the Court finds that the delegation clause in the present matter does not *alone* make a "clear and unmistakable" agreement that the arbitrator determines the arbitrability of the matter.

8

ii. *Incorporation and Reference to American Arbitration Association Rules*

The Court's analysis does not end here, however.  The Ninth Circuit has also held that "incorporation of the [American Arbitration Association ("AAA")] rules constitute clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130 (9th Cir. 2015); *see also Oracle America*, 724 F.3d at 1074 ("Virtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitute clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").  This is because the AAA "provides that the arbitrator shall have the power to rule on his or her own jurisdiction, including may objection with respect to the… validity of the arbitration agreement." *Brennan*, 796 F.3d at 1130. (internal quotation marks omitted).

Notably, the Ninth Circuit explicitly limited its holding in *Brennan* to the facts of the case, which involved an arbitration agreement "between sophisticated parties." *Brennan*, 796 F.3d at 1131.  The Ninth Circuit noted that its holding "should not be interpreted to require that the contracting parties be sophisticated or that the contract be commercial before a court may conclude that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent." *Id.* (quoting *Oracle*, 724 F.3d at 1075 & n.2) (internal quotation marks omitted).  The Ninth Circuit added that "our holding does not foreclose the possibility that this rule could also apply to unsophisticated parties or to consumer contracts." *Id.*  (noting that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts.").  This left an open question as to whether courts must consider the sophistication of the parties.

In the aftermath of *Brennan*, courts in the Ninth Circuit have split on this issue. *Compare e.g.*, *Eiess v. USAA Federal Savings Bank*, 404 F.Supp.3d 1240, 1252 (N.D. Cal. 2019) (finding that a majority of the lower courts in the Ninth Circuit have "held

9

that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party" because an unsophisticated party cannot fairly be said to clearly and unmistakably agree to delegate gateway questions of arbitrability without first reviewing and understanding the arbitration rules), *with Gerlach v. Tickmark Inc.*, No. 21-cv-2768-YGR, 2021 WL 3191692 at \*4 (N.D. Cal July 28, 2021) (collecting cases finding that "the greater weight of authority has concluded that the holding of [*Brennan*] applies similarly to non-sophisticated parties.") (internal quotation marks and citation omitted).  The courts holding that the sophistication of parties is not required have reasoned that under California law contract principles, courts look to the writing of the contract itself to decipher its intent and not the sophistication of the contracting parties.  *See e.g.*, *Razzaghi v. UnitedHealth Group*, 18-cv-1223-AG-JDE, 2018 WL 7824552 (C.D. Cal Sept. 17, 2018); *see also* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible").  Furthermore, factors that make a party "sophisticated" for purposes of clearly and unmistakably agreeing to delegate gateway questions of arbitrability "are poorly suited to a standard definition upon which parties can rely to avoid uncertainty or surprise in the meaning of the instrument they signed." *Hernandez v. United HealthCare Servs., Inc.*, No. SACV180420DOCKESX, 2018 WL 7458649, at \*5 (C.D. Cal. July 26, 2018); *see also McLellan*, 2017 WL 4551484, at \*3 (noting that "[a] party-by-party assessment of sophistication under some loose amalgam of personal education, line of work, professional knowledge, and so on would undermine contract expectations in potentially random and inconsistent ways.").

Indeed, courts in this district have consistently found that the existence of the AAA is an express delegation of arbitrability without factoring in the sophistication of the parties.  *See e.g.*, *Maybaum v. Target Corp.*, No. 2:22-cv-00687-MCS (JEMx), 2022 WL 1321246, at \*5 (C.D. Cal May 3, 2022) (finding that a "majority of courts have concluded that *Brennan* applies equally to sophisticated and unsophisticated

parties."); *see also Chaine v. Tesla Energy Operations, Inc.*, No. CV 20-9082-JFW(GJSX), 2021 WL 4932733, at *4 (C.D. Cal. Apr. 8, 2021) (finding similarly that the majority view also finds that the JAMS Streamlined Arbitration Rules also constitute "clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability, even if one or more of the parties are unsophisticated."); *see also Miller v. Time Warner Cable Inc*., No. 8:16-cv-00329-CAS (ASx), 2016 WL 7471302, at *5 (C.D. Cal. Dec. 27, 2016) ("[T]he greater weight of authority has concluded that the holding of [Brennan] applies similarly to non-sophisticated parties.").  The Court agrees with the numerous courts in this district and similarly holds that the incorporation of the AAA constitutes clear and unmistakable evidence that the parties agreed to delegate gateway questions of arbitrability regardless of the sophistication of the parties.[3]

Plaintiff raises three textual arguments.  First, Plaintiff counters that the Agreement lacks a clear and unmistakable delegation to the arbitrator because there are portions of the Agreement that suggest judicial involvement.  (Docket No. 16 at 25).  Second, Plaintiff argues that the language "any arbitration hereunder" infers that the AAA does not cover the gateway question of arbitrability.  (Docket No. 26 at 9–11).  Third, Plaintiff argues that because the Court has found that the Agreement's delegation provision is insufficient, the Agreement's language "as modified herein," means that "the AAA rules therefore do not even apply as to delegation issues in the first place."  (*Id.*).  The Court finds these arguments unavailing.

Here, the Agreement specifically provides under Section 7 that "[a]ny

---

[3] Even if the Court were to find that sophistication of the parties should be considered, the Court finds that, in this case, Plaintiff is a sophisticated party.  As discussed further below *infra* Section II.B., Plaintiff was hired as a Vice-President, Conversions Manager with a starting salary of $70,000, with 25 years of experience in the banking industry including as a prior chief financial officer and primarily as a remote worker with access to the internet.  (Docket No. 27-1 ¶¶ 3, 4, Exhs. A, B).  It is reasonable to conclude that Plaintiff had knowledge of the mechanics of a contract and how to raise an issue with the Agreement, if necessary.

arbitration hereunder shall be conducted under the Model Employment Procedures of the [AAA], as modified herein." (Docket No. 13-3 § 7). The Model Employment Procedures referenced in the Agreement contain the same exact provisions related to arbitrability found in *Brennan*, which the Ninth Circuit found sufficient to demonstrate the parties' clear and unmistakable intent to delegate arbitrability to the arbitrator. *Brennan*, 796 F.3d at 1130; *see also* (Exh. F, Docket No. 13-15 at 12).[4]

Moreover, with respect to Plaintiff's first argument, Plaintiff identifies Section 14 of the Agreement, which covers the confidentiality provision for arbitration as problematic because it indicates that exceptions to the confidentiality rule include for "judicial" proceedings and breaches of this section can be pursued under "all available remedies provided by law." (Docket No. 13-3 § 14). Section 14 simply provides an exception to when the confidentiality provision for documents provided during the arbitration proceedings does not apply, which includes "judicial, regulatory, or arbitration proceeding, or as may be requested by governmental authority." (*Id.*). These exceptions are distinguishable from cases where courts found inconsistencies in the arbitration agreement suggesting that the parties did not intend to clearly and

---

[4] The Court takes judicial notice of the AAA rules pursuant to Fed. R. Evid. 201(b). A court may take judicial notice of a wide range of matters, including the rules of AAA. *See, e.g. Torres v. Secure Commc'n Sys., Inc.*, No. SACV2000980JVSJDEX, 2020 WL 6162156, at *3 (C.D. Cal. July 25, 2020) (taking judicial notice of AAA rules). Defendants were unable to provide a copy of the AAA rules from 2002 at the time Plaintiff signed the agreement but were able to access the archived version of the AAA rules from the earliest available archived version in 2006 to present. (Decl. of Teresa R. Tracy ("Tracy Decl."), Docket No. 13-9 ¶¶ 9–13, Exhs. E–G)). Each archived version since 2006 contained the above-mentioned provision that arbitrators have the power to rule on their own jurisdiction and the validity of the arbitration agreement and the AAA indicates that it first released these protocols in 1996. (*Id.* ¶ 10). In addition, in *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 209 (2d Cir. 2005), the Second Circuit quotes the 1999 AAA Commercial Arbitration Rules which had precisely the same language as used in the Model Employment Procedures from 2006 to present. It is logical to conclude this language has been contained verbatim in the AAA's rules since at least 1999. In any event, a reference to the AAA rules is sufficient to constitute clear and unmistakable intent to delegate, and an actual copy of the rules does not need to be provided.

unmistakably delegate arbitrability. *See e.g. Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (finding that contradictions in agreement that said that all disputes would be resolved by California courts and all disputes, including arbitrability, would be delegated to arbitrator were "artificial" because the provision "was prefaced with the term '[e]xcept as it otherwise provides,' which eliminated the inconsistency….").

As to Plaintiff's second and third arguments, her interpretation of the contract language is confusing and flawed. While the Agreement does not specifically indicate that the AAA rules apply to the gateway question of arbitrability, nowhere in the Agreement does it indicate the opposite. In fact, the AAA rules expressly state that jurisdictional issues including arbitrability are within the realm of the arbitrator. *See* AAA Emp't Arbitration Rules and Mediation Procedures, Rule 6, https://www.adr.org (follow "Rules, Forms, and Fees" menu; then follow "Employment Arbitration Rules and Mediation Procedures" hyperlink) (last visited Dec. 7, 2023). A contrary reading would result in an illogical understanding of the rules. Likewise, Plaintiff's reading of the "as modified," language is misguided. As Defendants point out, the "as modified," language simply means that the Agreement, to the extent it modifies the AAA rules, will control. The Court's finding as to the delegation issue does not modify the Agreement or the application of the AAA rules.

**B. Enforceability and Unconscionability of the Delegation Clause**

"When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). "Because a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator, the only remaining question is whether the particular agreement to *delegate* arbitrability— the [d]elegation [p]rovision—is itself unconscionable." *Brennan*, 796 F.3d at 1132 (emphasis in original). "Even if a delegation of arbitrability is clear and unmistakable

1    it may be found unenforceable if the delegation *itself* is unconscionable." *Saravia v.*

2    *Dynamex, Inc.*, 310 F.R.D. 412, 419 (N.D. Cal. 2015) (emphasis in original) (citing

3    *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71–74 (2010)).  The party opposing

4    arbitration has the burden of proving that the delegation provision is unconscionable.

5    *See Engalla v. Permanente Medical Group*, 15 Cal. 4th 951, 972 (1997) ("[A] party

6    opposing the petition [to arbitrate] bears the burden of proving by a preponderance of

7    the evidence any fact necessary to its defense.");  *Pinnacle Museum Tower Ass'n v.*

8    *Pinnacle Market Development (US), LLC*, 55 Cal. 4th 223, 236 (2012) ("[T]he party

9    opposing arbitration bears the burden of proving any defense such as

10   unconscionability.").

11         Here, Plaintiff's initial Opposition raised several procedural and substantive

12   challenges to the unconscionability of the Agreement as a whole including that it is

13   adhesive, lacks mutuality, contains improper fee shifting provisions, illegal costs

14   sharing, does not allow for judicial review, and limits discovery.  (Docket No. 18 at 6–

15   17).  Likewise, Plaintiff's supplemental opposition recycles its unconscionability

16   arguments as to the Agreement as a whole and argues that they apply equally to the

17   delegation clause.  (Docket No. 26 at 15–18).  The Court disagrees precisely because

18   these arguments apply to the Agreement as a whole, not merely the delegation

19   provision.  Challenges to the contract as a whole include grounds that "directly affects

20   the entire agreement (e.g., the agreement was fraudulently induced)," or "that the

21   illegality of one of the contract's provisions renders the whole contract invalid."  *Rent-*

22   *A-Center*, 561 U.S. 63 at 68–70 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546

23   U.S. 440, 444 (2006)).  As such, the Court declines to address Plaintiff's arguments as

24   they pertain to the Agreement as a whole (i.e. that the unconscionability of the

25   provisions renders the contract invalid), which is an issue to be determined by the

26   arbitrator.  *Mohamed*, 848 F.3d at 1210 (quoting *Rent-A-Ctr.*, 561 U.S. at 73) ("When

27   considering an unconscionability challenge to a delegation provision, the court must

28   consider only arguments 'specific to the delegation provision.'"); *see also McLellan*,

14

2017 WL 4551484, at *1 ("Challenges [to the validity of a delegation clause] may be considered by courts, but challenges [to the validity of the agreement to arbitrate] must go to the arbitrator pursuant to the delegation clause.").

Nevertheless, the Court will address the merits of Plaintiff's unconscionability arguments as they pertain to the delegation clause only, which include whether: (1) the Agreement is a contract of adhesion; and (2) Plaintiff never received a copy of the AAA rules. The remaining issues of lacking mutuality, improper fee shifting, illegal cost sharing, lack of judicial review, and discovery limits are issues that address the agreement as a whole, not merely the delegation provision. *See Rent-A-Center*, 561 U.S. at 73–4 (explaining that a court may decline to address unconscionability issues such as fee-splitting arrangements and discovery limits when they apply to agreement as a whole and not to the issue of the delegation clause).[5]

Unconscionability under California law "has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 99 (2000). California courts apply a "sliding scale" analysis in determining unconscionability: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable and vice versa." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1260 (9th Cir. 2017) (quotations and citations omitted). Thus, although procedural and substantive unconscionability must both be present for the contract to be declared unenforceable,

---

[5] In determining whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Federal courts sitting in diversity look to the law of the forum state when making choice of law determinations. *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir.2008) (per curiam). Here, the forum state is California and as such the Court will apply California law to determine whether the delegation provision is unconscionable. Further, both parties only address unconscionability under California law.

1   "they need not be present to the same degree." *Baltazar v. Forever 21, Inc.*, 62 Cal.4th

2   1237, 1243 (2016) (internal quotation marks and citations omitted).  The California

3   Supreme Court has emphasized that "unconscionability requires a substantial degree

4   of unfairness beyond 'a simple old-fashioned bad bargain.'" *Id.* at 1245 (quoting

5   *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1160 (2013)). "Rather,

6   unconscionable contracts are those that are so one-sided as to 'shock the conscience.'"

7   *Mohamed*, 848 F.3d at 1210 (internal quotation marks and citations omitted).

8           As to the issue of this being a contract of adhesion, Plaintiff argues that the

9   Agreement was procedurally unconscionable because she was required to sign "as a

10  condition of employment" and had "no meaningful opportunity to negotiate the

11  terms." (Docket No. 26 at 15–16).  This is simply not the case.  As part of Plaintiff's

12  employment application on March 5, 2023, she received a copy of the Agreement and

13  signed it on the same day.  (Docket No. 13-2 ¶ 9, Exh. A).  She then received her offer

14  letter on March 19, 2002, indicating her position, title, and start date.  (Docket No. 27-

15  1, Exh. A).  Plaintiff had over 41 days prior to the start of her employment to discuss

16  the Agreement but never raised any issues.  (Docket No. 27 at 9).  Again, on her first

17  day of employment on April 15, 2002, Plaintiff had the opportunity but did not

18  challenge the Agreement when it was presented to her in an acknowledgment form as

19  a checklist of documents she received as part of her employee onboarding orientation

20  procedures.  (Docket No. 13-2 ¶ 9.d).  Plaintiff signed and acknowledgment that she

21  received various employment related documents including a copy of the Agreement.

22  (*Id.*).  Plaintiff had ample time to review and multiple opportunities to raise issues

23  with the Agreement.  This undercuts any argument that there was an element of

24  surprise or that Plaintiff was placed under duress or otherwise manipulated into

25  signing the Agreement.

26          Further, Plaintiff was not an unsophisticated party who was subjected to a high

27  pressure "take it or leave it" employment agreement.  *See e.g. Armendariz*, 24 Cal. 4th

28  at 115 (noting that there is an exception to "the economic pressure exerted by

1   employers" for *"the most sought-after employees*.") (emphasis added); *see also*

2   *Pompliano v. Snap Inc.*, No. CV173664DMGJPRX, 2018 WL 3198454, at *5 (C.D.

3   Cal. Apr. 11, 2018) (finding that a high-level executive who was sought after and

4   negotiated compensation increase faced minimal oppression or surprise).  On the

5   contrary, Plaintiff was hired as a Vice-President, Conversions Manager with a starting

6   salary of $70,000, with 25 years of experience in the banking industry including as a

7   prior chief financial officer and director of operations.  (Docket No. 27-1 ¶ 4.a-b,

8   Exhs. A, B); *see Razzaghi*, 2018 WL 7824552 at *2 (finding that a six-figure salary

9   undercut argument that plaintiff was "unsophisticated" and therefore the agreement

10  was unconscionable).  Accordingly, the court finds that as to the issue of the

11  delegation clause only, there is no procedural unconscionability due to adhesion.

12      Next, Plaintiff claims that she was never provided a copy of the AAA rules and

13  would not have known how to find it online.  The Court finds that failure to provide a

14  copy of the AAA did not render the agreement procedurally unconscionable.  *See e.g.*

15  *Bigler v. Harker School* 213 Cal.App.4th 727, 737 (2013) (finding no procedural

16  unconscionability despite failure to provide a copy of AAA rules).  The delegation

17  provision explicitly incorporated the AAA rules by reference in its own clearly labeled

18  and visible section.  *See, e.g., Baltazar*, 62 Cal.4th at 1246 ("[C]ourts will more

19  closely scrutinize the substantive unconscionability of terms that were 'artfully

20  hidden' by the simple expedient of incorporating them by reference rather than

21  including them in or attaching them to the arbitration agreement.").  Moreover,

22  Plaintiff was employed as a Vice-President level employee who was a full-time

23  remote employee with access to the internet.  (Docket No. 27 at 7).  Accordingly, the

24  Court finds that Plaintiff has failed to meet her burden as to procedural

25  unconscionability as it relates to the delegation clause.

26      Because Plaintiff does not demonstrate that the agreement is procedurally

27  unconscionable, the Court does not address whether it was substantively

28  unconscionable.  *See e.g. Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th

Cir. 2013). (Under California law, "a contract must be both procedurally and substantively unconscionable to be rendered invalid.").

III.   **CONCLUSION**

Based on the foregoing discussion, Defendants Motion is **GRANTED** and the action is **STAYED** pending the arbitration proceedings.  The parties shall file a joint report every ninety days from the start of the date of this Order.  The parties are also directed to jointly notify the Court within forty-eight hours of the conclusion of the arbitration proceeding.

**IT IS SO ORDERED.**

Dated:  December 8, 2023 _____

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE